NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 09a0062n.06

Filed: January 27, 2009

No. 08-1306

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CHARLES EVANS HUGHES,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    BOGGS, Chief Judge, and CLAY, Circuit Judge; BERTELSMAN, District Judge.[*]

    **CLAY, Circuit Judge.**    Charles Evans Hughes appeals the criminal judgment and commitment order entered on March 6, 2008 by the United States District Court for the Western District of Michigan. Hughes was convicted after a jury trial of income tax evasion pursuant to 26 U.S.C. § 7201. He challenges on appeal several evidentiary rulings made by the district court and alleges that he was denied his right to a fair trial due to prosecutorial misconduct. For the reasons that follow, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

---

    [*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## A. Procedural History

On March 29, 2007, a federal grand jury in the Western District of Michigan returned a four-count indictment charging Charles Evans Hughes with income tax evasion in violation of 26 U.S.C. § 7201 for the calendar years 2000, 2001, 2002, and 2004.

Hughes was tried before a jury, and on December 6, 2007, he was found guilty on all counts. On March 5, 2008, the district court sentenced Hughes to a term of fifteen months of imprisonment on each count to be served concurrently, with restitution in the amount of $37,559.00. Hughes filed a timely notice of appeal.

## B. Substantive Facts

On November 21, 2007, Hughes filed a pretrial motion *in limine* requesting that he be permitted to introduce into evidence a "reliance package" of materials in support of his asserted belief that the law did not require him to file tax returns or pay taxes. The motion stated that Hughes' belief was based in part upon his understanding that the Sixteenth Amendment was never ratified and that the tax code consequently does not require people to pay income tax or to file income tax returns. The materials included a video, a book entitled "The Law That Never Was," and a written legal opinion. The government filed its own motion *in limine*, requesting that the court preclude the defense from admitting any evidence which sought to establish that the income tax laws of the United States are unconstitutional or unlawful.

After hearing arguments by both parties, the district court ruled in favor of the government. The court also stated that the "reliance package" might be relevant to show Hughes' intent, explaining that "if that's the excuse he used in oral conversations, then it may be

relevant to show that he has an intent to evade the tax laws and will use any argument he can to get out of the tax laws." (Trial Tr. at 8.)

At trial, the government presented a number of witnesses, including Hughes' former employers, to establish that Hughes had taxable income for the years in question. The government also presented witnesses who testified that each time Hughes was given a W-4 to complete, he either checked "exempt" on the form to indicate that he did not want any taxes withheld, or he wrote "99" as the number of deductions. A former employer testified that when he asked Hughes about his tax-exempt status, Hughes replied that he did not have to pay taxes because his brother-in-law, Stan Smolinski, told him he was not required to do so.

The government also presented Paul Crowley of the Internal Revenue Service ("IRS") who testified that Hughes had filed a joint return for tax year 1999 but did not file returns for tax years 2000-2006, even though the IRS received W-2 forms reflecting taxable income. Crowley testified that in 1999, Hughes filed a complex return, where he used specialized forms and schedules, and correctly reported capital gains, losses, itemized deductions, and interest. Crowley also testified regarding certified records from the State of Michigan that indicated that Hughes had not filed state income tax returns from 2000-2004. Paula Cochran, an IRS revenue agent and tax auditor, testified that Hughes' income exceed the minimal filing requirements for the years in question. She testified that she had calculated that Hughes owed the government a "little over $70,000" for the four years charged in the indictment.

Hughes testified on his own behalf. He testified that he began working in the sprinkler trade in 1974, but that in the 1980s and 1990s, he suffered several major on-the-job injuries for which he required surgery and was paid workman's compensation. After surgery in 1998, he

attempted to change careers and engaged in commodity trading. In 2000, he took lump sum distributions from his pensions. He testified that he thought the pension distributions and Social Security disability payments were non-taxable benefits like his workman's compensation payments. He testified that he was granted a full disability pension in 2003 and had not worked since 2002.

Hughes stated that he did not file tax returns in 2000, 2001, 2002, and 2004 because he thought that as a sole proprietor he was not required to file returns, and because he believed he did not have sufficient income in light of the $161,000 loss he incurred in his commodities trading business. He stated that he believed that the loss offset any gains, and did not realize there was a $3,000 yearly limit on investment losses. He also testified that he believed he did not have any taxable income from Social Security or his disability pension, and consequently he believed that he was not required to file returns for those years.

Hughes testified that when he received a notice from the IRS, he set up an appointment and met with the IRS to discuss his case on two occasions. He stated that on December 7, 2004, he explained to IRS Special Agent Joanne McLean that he was on Social Security disability, that his disability pension was not taxable, and that he did not have to file taxes. He stated that McLean never told him he was wrong.

He stated that he was told that he could indicate "exempt" on W-4 forms for the first five months of the year and then, depending on the money earned, he could execute another W-4 and change his exemption status to reflect his actual dependents. He also testified that he never received deficiency notices from the IRS or notices that it was a criminal offense to fail to file, and that he did not realize that his pension was taxable until after he was arrested in 2007. He

denied that he ever attempted to evade paying taxes, conceal assets, lie to an IRS agent, or willfully violate the tax laws.

After Hughes' direct testimony, the district court ruled that the government could impeach Hughes with what he had told the IRS about his reasons for failing to file returns, and informed the defense that they could explain this to the jury prior to Hughes' cross-examination. Hughes returned to the stand and testified that he told the IRS that he did not file returns because he had "done research on [his] own and had come to certain beliefs that [he] was not under any legal obligation to file a return." (Trial Tr. at 382.) He testified that he had obtained documented proof in 1999 that he did not have to file a return, and that he took some of the materials to a meeting with the IRS.

After Hughes testified, the court called a sidebar conference and informed the prosecution: "All right. I'll let you get into the fact that his belief is constitutional[ly] based; in other words, the Sixteenth Amendment. And I will immediately give the jury the instruction that this is not a good-faith basis for not paying income tax." (Trial Tr. at 385.)

On cross-examination, Hughes stated that he did not file returns based on a combination of beliefs that he had no legal obligation to file based on his research, and because he believed his trading losses offset any requirement to file and that his disability proceeds were nontaxable. He confirmed that he had purchased a tax protester "reliance package" from William Benson, and that he knew that Benson had been convicted of tax evasion. He testified that the reliance package dealt with the claim that the Sixteenth Amendment was never properly ratified. The court then instructed the jury that a claim that the Sixteenth Amendment had not been ratified does not provide a good-faith basis for not paying income tax.

After the government cross-examined Hughes, the defense rested. The government called three rebuttal witnesses. Stan Smolinski, Hughes' brother-in-law, testified that he was employed for 27 years as an IRS manager, but that Hughes never asked him any questions about tax laws, the taxability of Social Security payments, pension income, or the Sixteenth Amendment. Paula Cochran testified that she had been mistaken when she stated on direct examination that only corporations or partnerships may deduct business losses, and that, in fact, individuals may also take business losses. She testified that Hughes' losses were limited to $3,000 a year, however, because under IRS regulations he was as an investor, as opposed to a trader or dealer.

Bruce Harris testified that Hughes' "reliance package" was purchased from Benson, a known tax protester and promoter of tax protester materials. Harris testified that in February of 2004, Hughes carried his box of tax protester materials into the Grand Rapids IRS office and demanded to meet with someone from the IRS to discuss a letter he had received that informed him that he had overdue tax returns. Harris testified that he met with Hughes and Benson, and that Hughes handed him the box of materials and said "That's my statement." Hughes then handed Harris a "Power of Attorney" form signed by Hughes which authorized Benson to speak on Hughes' behalf with regard to certain tax matters. Harris told Hughes that he would accept the materials but that he probably would not like the materials because he worked in the IRS Criminal Investigation Unit. Benson stated that "I know you won't like the results. But we're building our good-faith belief early." (Trial Tr. at 493.)

In closing, the government argued that it had established the elements of tax evasion, and that a refusal to acknowledge the law does not constitute a good-faith misunderstanding of the

law. Defense counsel argued that the government had a "major proof problem" because despite the "almost unlimited resources" of the federal government, the government had left "major questions" unanswered, such as the type of IRA account Hughes had. (Trial Tr. at 535-46.) Defense counsel also pointed out the inconsistencies in Paula Cochran's testimony and argued that Hughes could have been legitimately confused about his tax liability.

On December 6, 2007, the jury found Hughes guilty on all counts of the indictment. On March 5, 2008, the district court sentenced Hughes to a term of fifteen months of imprisonment on each count to be served concurrently.

## DISCUSSION

### I.

Hughes argues that the district court abused its discretion in its evidentiary rulings by (1) denying Hughes' motion *in limine* and precluding the introduction of "reliance package" materials that supported his good-faith defense; (2) permitting the government, in a late trial ruling, to impeach Hughes with the materials; and (3) permitting the government to introduce prejudicial and improper rebuttal testimony. This Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Blackwell,* 459 F.3d 739, 752 (6th Cir. 2006).

### A.

Hughes first argues that the district court abused its discretion by denying Hughes' motion *in limine* to admit material that supported his belief that he was not required to file income tax returns. He argues that a defendant is entitled to submit testimony regarding such a belief, no matter how unreasonable the belief may be, and that this right includes the right to read excerpts from the proffered materials, if not the right to introduce the materials.

Hughes' argument is contradicted by Supreme Court precedent. In *Cheek v. United States*, the Court examined the claims of a defendant who, like Hughes, "paid his taxes for years, but after attending various seminars and based on his own study, . . . concluded that the income tax laws could not constitutionally require him to pay a tax." 498 U.S. 192, 206 (1991). The Court acknowledged that a taxpayer's understanding of the tax law can be at issue in a case, and that the willfulness requirement in criminal provisions of the tax code requires proof of knowledge of the law, because "in our complex tax system, uncertainty often arises even among taxpayers who earnestly wish to follow the law and it is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care." *Id.* at 205 (quotation marks and citations omitted).

The *Cheek* Court reversed some of the district court's rulings, holding that it was error for the court to instruct the jury not to consider Cheek's asserted belief that his wages were not taxable income. *Id.* at 207. However, the Court held that claims that provisions of the tax code are unconstitutional are "submissions of a different order" because they reveal full knowledge of the provisions at issue. *Id.* at 205. In such a case, the Court explained that "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness, need not be heard by the jury, and if they are, an instruction to disregard them would be proper[,]" and held that it was "not error . . . for the District Judge to instruct the jury not to consider Cheek's claims that the tax laws were unconstitutional." *Id.* at 206-07.

Here, Hughes acknowledged at trial that the reliance package materials were being submitted to support his belief that the tax laws are unconstitutional. The Court's holding in

*Cheek* is therefore fatal to his argument. Moreover, the district court allowed Hughes to submit evidence regarding his belief that his own income was not taxable.

Hughes relies upon three cases to support a contrary conclusion: *United States v. Gaumer*, 972 F.2d 723 (6th Cir. 1992), *United States v. Nash*, 175 F.3d 429 (6th Cir. 1999), and *United States v. Middleton*, 246 F.3d 825 (6th Cir. 2001). These cases are distinguishable from the case at hand. In *Gaumer*, the defendant sought to admit materials relating to the scope of the term "excise tax." This Court noted that Gaumer asserted a belief that he was not engaged in excise-taxable activities, and found that the materials he sought to admit "discusse[d] the scope of the term 'excise tax' in a way that could conceivably be thought to provide some comfort to a person in defendant Gaumer's situation." 972 F.2d at 725. Unlike Hughes and unlike the defendant in *Cheek*, Gaumer was not arguing that his good-faith belief stemmed from his belief that the tax code was unconstitutional.

In *Nash*, this Court acknowledged that under *Gaumer*, a defendant should be allowed to present relevant excerpts from documents that support a conclusion that he was not required to file income tax returns, but this Court found no abuse of discretion where the district court excluded other materials because it found that the probative value of the evidence was substantially outweighed by the danger of confusing the jury under Rule 403. 175 F.3d at 435. Likewise, in *Middleton*, this Court affirmed the district court's decision to exclude evidence regarding the defendant's beliefs because it found the materials to be "hopelessly confusing to the jury." 246 F.3d at 839.

These cases do not contradict the Supreme Court's finding in *Cheek* that "a defendant's views about the validity of the tax statutes . . . need not be heard by the jury." 498 U.S. at 206.

Consequently, we find that the district court did not abuse its discretion when it excluded the materials that Hughes sought to admit.

B.

Hughes next argues that because he was prevented from introducing evidence of his belief that the tax statutes are unconstitutional, the district court abused its discretion by permitting the government to impeach him with evidence of the same.

On direct examination, Hughes submitted reasons for nonpayment of taxes that contradicted statements he had made before the trial. He testified that he did not file tax returns for the years covered by the indictment because (1) he thought as a sole proprietor he was not required to file returns; (2) he believed he did not have sufficient income in light of the losses he incurred in his commodities trading business; (3) he did not realize there was a $3,000 yearly limit on investment losses; and (4) he believed he did not have any taxable income from Social Security or his disability pension. After this testimony, the district court ruled that the government could impeach Hughes with what he had told the IRS about his reasons for failing to file returns and the research he had done on the issue.

It is established that evidence which is not admissible for one purpose may be relevant and admissible for another. *United States v. Abel*, 469 U.S. 45, 56 (1984). Further, when a defendant chooses to take the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown v. United States*, 356 U.S. 148, 154 (1958). A defendant "'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.'" *Id.* (quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)). Consequently, even though Hughes' "reliance package"

materials were not admissible to negate willfulness under *Cheek*, there was no error in permitting the government to impeach Hughes' credibility with his contradictory statements regarding his reasons for not paying taxes.[1]

Hughes opened the door to the government's impeachment when he offered potentially legitimate reasons for failing to pay taxes. Consequently, his argument that the district court erred by admitting impeachment evidence lacks merit.

## C.

Hughes also argues that the district court abused its discretion by admitting the testimony of three government witnesses on rebuttal. A district court has broad discretion to determine the scope of evidence to admit on rebuttal. *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005). Evidence introduced on rebuttal typically serves to "'rebut new evidence or new theories proffered in the defendant's case-in-chief,' and is not limited by the fact that the plaintiff could have introduced the proffered evidence in his case-in-chief." *Id.* (quoting *Benedict v. United States*, 822 F.2d 1426, 1428 (6th Cir. 1987)).

The first rebuttal witness called by the government was Stan Smolinski, Hughes' brother-in-law and a retired IRS employee. Smolinski testified that he was employed for 27 years as an IRS manager, but that Hughes never asked him any questions about tax laws, the taxability of Social Security payments or pension income, or the Sixteenth Amendment. At trial, Hughes

---

[1]The First Circuit addressed a similar sequence of events in *United States v. Bonneau*, 970 F.2d 929 (1st Cir. 1992). The *Bonneau* court held that even when evidence is deemed inadmissible under *Cheek*, when a defendant takes the stand to profess reasons why he did not pay taxes, the prosecutor is "entitled to prove that the defendant held other beliefs--whether constitutional or philosophical--that persuaded him not to pay taxes." *Id.* at 933.

objected to Smolinski's testimony, arguing that he was an improper rebuttal witness because Hughes did not mention Smolinski in his own case-in-chief. The government argued that Smolinski contradicted Hughes' assertion that he had a good-faith belief that he was not required to pay taxes. The district court held that his testimony was admissible, explaining to defense counsel that "[t]he whole thing about good-faith belief came in during your case rather than the government's case. I mean they put in a lot of evidence to support – or, contradict that. But he's the one that said he had a good-faith belief." (Trial Tr. at 470-71.)

A review of the record supports the court's ruling. Hughes did present evidence in his case that the IRS was either inaccessible or uncooperative, and he asserted a good-faith belief that he was not required to pay taxes. It was not an abuse of discretion for the district court to admit the testimony to establish that Smolinski was a potential source of tax advice but that Hughes never asked him a tax-related question. According to the testimony of a former employer, Hughes had stated that he had received advice from Smolinski. Moreover, Hughes had the opportunity to explain why he did not choose to contact Smolinski, and he was free to argue that he was under no obligation to do so. It is therefore fair to conclude that the district court did not abuse the "broad discretion" it has to determine the scope of evidence to admit on rebuttal. *See Caraway*, 411 F.3d at 683.

Likewise, Hughes argues that the district court abused its discretion when it allowed Paula Cochran to testify on rebuttal. Cochran testified that (1) she had been mistaken in her previous testimony when she suggested that only corporations or partnerships may deduct business losses; (2) that individuals may also take business losses; and (3) that Hughes' losses

were limited to $3,000 a year under IRS regulations. Hughes argues that her testimony was not limited to rebuttal testimony, and that she was called to clarify information that she had offered in her own testimony. However, Hughes offers no support for the conclusion that the admission of this testimony was an abuse of discretion. "Although [a] district court can limit rebuttal testimony, it is not required to do so and it is not an abuse of discretion not to impose such a limit." *United States v. Rayborn*, 495 F.3d 328, 344 (6th Cir. 2007).

The third rebuttal witness was Bruce Harris, a former IRS employee who testified that Hughes purchased his "reliance package" from Benson, a known tax protester and promoter of tax protester materials. Harris testified that in February of 2004, Hughes and Benson carried a box of tax protester materials into the Grand Rapids IRS office and demanded to meet with him about the materials. He stated that when Hughes entered his office, Hughes handed him a "Power of Attorney" form authorizing Benson to speak on Hughes' behalf, and that Benson stated that " we're building our good-faith belief early."

Hughes argues that this testimony included impermissible hearsay evidence. However, the evidence shows that Hughes intended for Benson to act as his agent and that Hughes presented the Power of Attorney for that purpose. This Court has advised that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *United States v. Wiedyk*, 71 F.3d 602, 605 (6th Cir. 1995) (citing Fed. R. Evid. 801(d)(2)(D)).

Moreover, there is evidence that even if Benson was not Hughes' legal agent, Hughes adopted any statements Benson made. A court is permitted to allow into evidence a statement as non-hearsay if the statement is offered against a party and "is a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B); *see also United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996) (explaining that adoption can be manifested by any appropriate means, such as language, conduct, or silence). Here, Hughes' conduct in presenting Benson as his representative, as well as his silence when Benson declared that the materials were submitted to build a good-faith belief that Hughes was not required to pay income taxes, indicate that he adopted Benson's statements. Accordingly, we hold that the district court did not abuse its discretion by admitting Harris' testimony on rebuttal.

## II.

In his second assignment of error, Hughes argues that he was denied his right to a fair trial due to prosecutorial misconduct because the government: (1) engaged in improper and prejudicial cross-examination of Hughes at trial; (2) elicited improper rebuttal evidence; and (3) engaged in forensic misconduct in its argument to the jury.

This Court generally reviews *de novo* the question of whether prosecutorial misconduct requires reversal. *United States v. Stover*, 474 F.3d 904, 914 (6th Cir. 2007). However, when, as here, a defendant does not object to the prosecutor's statements at trial, this Court will only reverse for plain error. *United States v. Young*, 470 U.S. 1, 6 (1985); *United States v. Coker*, 514 F.3d 562, 567 (6th Cir. 2008).

Plain error review requires a court to determine whether "(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001); Fed. R. Crim. P. 52(b). "Only in exceptional circumstances in which the error is so plain that the trial judge and prosecutor were derelict in countenancing it will this court reverse a conviction under the plain-error standard." *Emuegbunam*, 268 F.3d at 406.

When reviewing claims of prosecutorial misconduct, this Court first determines whether the statements were improper. *Stover*, 474 F.3d at 915. Then, if they appear improper, the Court should "look to see if they were flagrant and warrant reversal." *Id.* (quotations and citation omitted).

"To determine flagrancy, the standard set by this Court is: 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000). Flagrantly improper remarks by the prosecutor require reversal. However, if the prosecutor's remarks are not flagrant, then this Court will only reverse "if proof of [the defendant's] guilt was not overwhelming, [the defendant] objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury." *Stover*, 474 F.3d at 915 (quoting *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994)).

A.

Hughes first argues that the government committed prosecutorial misconduct in its cross-examination of Hughes. Hughes states that the government exploded into a "barrage of vitriol" against Hughes, that in some cases the government did not permit him to answer questions, and that the prosecutor asked the same questions repeatedly, despite the objections of defense counsel. Hughes does not point to specific statements that were improper and flagrant; instead he appears to challenge the prosecutor's style on a more general level. We reject these arguments because Hughes has not shown that the comments were improper or that they "tended to mislead the jury or prejudice the defendant" as required by *Tocco*, 200 F.3d at 420. Moreover, Hughes has not demonstrated that these comments "seriously affected the fairness, integrity, or public reputation of the judicial proceedings" as required under the plain-error standard. *See Emuegbunam*, 268 F.3d at 406.

Hughes also states that the government inquired into attorney-client privileged communication, demanding to know what attorneys Hughes consulted with and what he told them. However, the record reflects otherwise. Hughes testified that he received a "reliance letter" from an attorney named Guy Curtis in a package of materials he bought from Benson. The prosecution inquired as to whether he knew Curtis was an attorney, and Hughes testified that he thought he was. There was no evidence that Curtis was Hughes' attorney, or that the prosecution inquired about confidential communications between Curtis and Hughes. Hughes' claim regarding prosecutorial misconduct as a result of a violation of the attorney-client privilege therefore lacks merit.

Finally, Hughes argues that the government improperly interjected facts not in evidence into the questions asked of Hughes. More specifically, he alleges that the prosecutor interjected "facts" that Benson was twice convicted of tax evasion, and that courts have rejected the argument that the Sixteenth Amendment was not properly ratified. Again, Hughes fails to establish that the questions were improper, that they "tended to mislead the jury or prejudice the defendant[,]" or that they "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *See Tocco*, 200 F.3d at 420 (prosecutorial misconduct standard)*; Emuegbunam*, 268 F.3d at 406 (plain error standard). Moreover, leading questions are permissible on cross-examination under Federal Rule of Evidence 611(c).

In sum, because Hughes does not establish that any alleged prosecutorial conduct was flagrant, or that he can meet the plain error standard, we reject his claim that the government committed prosecutorial misconduct in its cross-examination of Hughes.

B.

Hughes also argues that the government's introduction of rebuttal testimony constituted prosecutorial misconduct. This argument mirrors Hughes' argument that the district court abused its discretion in its evidentiary rulings when it admitted such testimony. This claim does not support a finding of prosecutorial misconduct because, as discussed above, no error occurred in the admission of the rebuttal evidence. Moreover, Hughes makes no argument that the evidence was presented with the deliberate intent to mislead the jury or that it prejudiced him, as required by *Tocco*, 200 F.3d at 420, and he has not argued that any alleged error constitutes plain error. We therefore reject this claim.

C.

Finally, Hughes argues that the government committed multiple instances of prosecutorial misconduct during closing arguments. First, Hughes argues that the government engaged in improper arguments in closing by attempting "to get some shock value out of the fact that defendant had a relative that worked for the IRS" and by arguing that Hughes was obligated to consult with a distant relative about his tax obligations and beliefs. However, Hughes does not present any legal support for his argument to establish why he believes that the comments were improper, and if so, whether they were flagrant. Moreover, this Court has held that in closing arguments, prosecutors may argue that a jury can draw reasonable inferences from the evidence presented at trial. *See United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007).

Next, Hughes reasserts his argument that the prosecutor improperly submitted evidence that Benson was convicted of tax evasion and that the courts have rejected the notion that the Sixteenth Amendment was not properly ratified. However, Hughes testified at trial that he knew that Benson was twice convicted of tax evasion and that he knew that the Sixteenth Amendment ratification argument had been rejected by the courts. This argument therefore lacks merit.

Third, Hughes argues that the government improperly vouched for its witnesses and bolstered its theory of the case by stating, "we all know [the income is] taxable. We all know that any reasonable person knows that [income is] taxable." (Trial Tr. at 530.) Again, Hughes fails to explain why he believes that the comments were improper, and if so, why they were flagrant. As discussed above, in closing arguments, prosecutors may argue that a jury can draw reasonable

inferences from the evidence presented at trial. *See Roach*, 502 F.3d at 434. Hughes has not shown that the arguments were improper.

Fourth, Hughes argues that, in its rebuttal argument, the government "marginalized and denigrated the defense and defense counsel." (Appellant's Br. at 49.) He cites passages where the government expressed sarcasm, such as the prosecutor's statement that, "[Defense counsel] had to say something. I sat there glad that I asked one of my witnesses where Munith was so that [defense counsel] didn't accuse the government of failing to prove to you where Munith was with his long list of other irrelevancies that we didn't prove, like what kind of an IRA is this." (Trial Tr. at 548.) However, this remark, like many of the prosecutor's remarks, was a response to defense arguments. In this example, the defense had argued that the government, with its "awesome power" and "almost unlimited resources" had failed to address "major questions that have not been answered" such as whether Hughes had a Roth or simple IRA. (Trial Tr. at 543-46.) This Court has advised that a "prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel." *Angel v. Overberg*, 682 F.2d 605, 607-608 (6th Cir. 1982).

In sum, Hughes fails to establish that the prosecutor's arguments in closing were improper, of if they were, that they were so flagrant as to warrant a reversal of conviction. *See Tocco*, 200 F.3d at 420-21. Moreover, he fails to establish that any alleged error constitutes plain error. Accordingly, we hold that the government did not commit reversible prosecutorial misconduct in this case.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.