BOGGS, J., delivered the opinion of the court, in which MERRITT, J., joined, with MERRITT, J. (pp. 474-75), also delivering a separate concurring opinion. CLAY, J. (pp. 475-87), delivered a separate dissenting opinion.
OPINION
BOGGS, Circuit Judge.
Michael Peak, convicted of first-degree murder and sentenced to life in prison, petitioned the United States District Court for a writ of habeas corpus. He argued that his Confrontation Clause rights had been violated at trial when the government played a tape recording of his co-defendant’s custodial statement without affirmatively calling the co-defendant as a witness, over Peak’s objection. The court denied the petition, and Peak now appeals that denial. Though the trial court may well have violated Peak’s constitutional rights when it failed to sustain his objection, we cannot say, as the Supreme Court now requires, that fairminded jurists could not disagree with our opinion when the co-defendant was in the courtroom and available to testify and be (cross-) examined. In fact, four such fairminded justices of the Kentucky Supreme Court did disagree. Therefore, we are compelled to AFFIRM.
I
In 2002, Leann Bearden, Patrick Meeks, and Michael Peak were charged with murdering, robbing, and conspiring to murder an unidentified person. Peak v. Kentucky, 197 S.W.3d 536, 541 (Ky.2006).[1] The investigation of Peak, Meeks, and Bearden began when Bearden told Charles Mack-em, a man to whom she sold cocaine, that she had been involved in a murder. Mack-em told the story to police in exchange for immunity from prosecution.
The case was notable for its lack of physical evidence or witnesses. No blood or fingerprints were found at the scene. *468 The murder weapon was never found. The only witnesses were the three co-conspirators themselves. Of the three, only Bearden testified. Her testimony was the version of the facts primarily relied upon at trial.[2]
According to Bearden’s testimony at trial, she met the victim, whom she only knew as “Mike,” at a social occasion in Louisville, where they used cocaine together. At another social event, Mike told Bearden that he wanted to sell a kilo of cocaine. After learning that Mike was trying to sell a kilogram of cocaine, Peak, Meeks, and Bearden conspired to kill Mike in order to take the cocaine.[3] Peak allegedly said to Meeks, “Yeah, you get the gun and I’ll do the shooting.” She testified that the next night she saw Meeks give Peak a gun. Bearden testified that at that point, she worried that the men were actually planning to kill Mike.
The next night, two nights after the three had first discussed killing the victim, Bearden, Peak, and Meeks drove to a farmhouse together.[4] Meeks told Bearden to call Mike and tell him there was a buyer for the cocaine. Bearden testified that she thought Meeks also had a gun at this point, so that both men were armed. She testified that Peak told her, “When you walk in and Mike’s behind you, you better get out of the way or you’re going to get shot yourself.” Bearden testified that when she, Meeks, and the victim arrived at the farmhouse she went inside, hoping to find a way out of the house so that she could escape. She testified that no one was right behind her, but that she believed Mike came in next, and that Meeks did not come in the house. She stated that she did not see Peak when she went into the house. She stated that she “wound up” walking into a bathroom and was trying to open a window in the bathroom when she heard two shots. She testified that she heard Peak cursing and then calling for Meeks, yelling: “He’s not dead, he’s still standing, and he’s coming towards me.” She then left the bathroom, and ran into Peak, who said: “Get Meeks and get him in here.”
Bearden further testified that when it was getting light out, hours later, Meeks came outside and told her to come in to help clean up blood. She testified that she saw blood “everywhere” but that she did not see Mike’s body. Bearden testified that, when they were finished cleaning, they drove out into the country and Peak got out of the car to throw out the gun. However, Bearden stated that she did not see the gun at any point. She merely stated that Peak said: “We need to get rid of the gun.”
Later in her testimony, Bearden talked about telling the police “everything” as soon as they showed her photos of Peak and Meeks at an initial questioning. She took them to where the gun had allegedly been discarded and to the farmhouse, *469 which had been “burnt.” In her testimony, Bearden verified that she had signed a deal with prosecutors that if she testified truthfully they would not seek the death penalty against her.
After direct examination of Bearden, Peak’s attorney moved for severance and a mistrial, because Bearden was “wearing two hats,” as she was serving as both a defendant and as a -witness for the prosecution, and because she had been allowed to be in the courtroom during the prosecution’s opening statement, which gave her “the benefit of hearing him characterize her testimony immediately before getting on the witness stand.” Meeks also moved for severance of the trials. These motions were denied.
During cross-examination, Bearden was demonstrated to be a witness with somewhat less than sterling credibility. She agreed that she was a drug dealer. She was impeached with contradictory statements that she had made about being frightened primarily of Meeks, not of Peak. She admitted that she did not actually see the gun, when she had said initially that Meeks gave Peak the gun. She stated she never saw blood on Peak or Meeks after the killing. She also stated that she became pregnant with Peak’s child and had an abortion. Finally, Bear-den admitted that she had failed a polygraph exam that she took while imprisoned.
The only direct evidence establishing Peak as the shooter in this murder came from Meeks’s unsworn taped confession.[5] This confession was undisputedly made to police while Meeks was in custody, after his arrest. At trial, Meeks asserted his Fifth Amendment right not to incriminate himself. Because the state wanted to play his taped interrogation, it created a redacted version to skirt the statements that would violate Meeks’s right against self-incrimination. However, Meeks thought this version made him appear even more to have been the shooter. Because he did not want this redacted version to be played, Meeks waived his Fifth Amendment rights so the state could play the unredacted tape. Meeks was available to be called as a witness at trial. Peak had not had any prior opportunity to cross-examine Meeks.
Peak objected to the government’s introduction of Meeks’s taped confession, arguing that playing the tape without calling Meeks to the stand at the same time violated Peak’s Sixth Amendment right to confront the witnesses against him. He also moved for a mistrial. His objections were overruled. In overruling his objections, the court stated that any party could now call Meeks, as his Fifth Amendment rights had been waived.
The forty-five-minute tape was then played, during the testimony of Detective Griffin of the Kentucky State Police, who had arrested Meeks. On the tape, Meeks stated that Peak was the shooter. Meeks’s statement was played twice more during trial: during the government’s closing argument, and, at the jury’s request, during deliberations. The tape stated in relevant part:
[Mike, Leann, and I] [wjalked in the door [of the house where the victim was killed]. Next thing I know Leanne [sic] — Tony—Tony jumped out from a doorway[,] pulled a gun[,] and Leanne screamed, ran. I heard a gunshot. I ran. We both ran outside. I heard more gun shots. I came back inside, *470 found the individual laying on the ground face down on the ground in a pool of blood with Tony standing pretty much over top [sic] of him hollering and screaming. Then I proceeded to go back outside because I heard Leanne scream. I went outside. She was screaming, freaking out. I go back inside. Tony’s pretty much freaking out ... over what he’s done. And then ... worried about where the drugs are. Finds the drugs. Gets in Leanne’s car. Drives it past the river. Throws the gun in the river.[6]
Meeks also stated, “I didn’t kill anybody” and “I thought the gun was for Tony’s protection.”
At the end of the trial, the jury convicted Peak of intentional murder, first-degree robbery, conspiracy to commit murder, and tampering with physical evidence. He was sentenced to life in prison without the possibility of probation or parole for twenty-five years. Meeks was convicted of wanton murder, first-degree robbery, conspiracy to commit murder, and tampering with physical evidence. He was sentenced to life in prison without the possibility of probation or parole for twenty-five years. Peak, 197 S.W.3d at 540. Bearden pleaded guilty to murder, robbery, and conspiracy and received a twenty-year sentence.
Peak appealed his conviction. His appeal was consolidated with Meeks’s. Ibid. A majority of the Kentucky Supreme Court, comprised of four justices, affirmed Peak’s conviction, but only a three-justice plurality joined the opinion.[7] The plurality reasoned that the Confrontation Clause does not bar a statement as long as “ ‘the declarant is present at trial to defend or explain it.’ ” Id. at 544 (quoting Crawford v. Washington, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Because Peak had the opportunity to call Meeks as a witness and chose not to, the court reasoned, he “waived his right to confrontation.” Ibid.
Three justices dissented, stating that they believed the trial court had erred in overruling objections to a “clear violation” of the Confrontation Clause, and that they would grant Peak a new trial. Id. at 551. The dissent relied on Crawford’s language that “[wjhere testimonial evidence is at issue, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Id. at 550 (quoting Crawford, 541 U.S. at 68, 124 S.Ct. 1354). Meeks’s statement was undeniably testimonial, as Crawford explicitly held that “police interrogations” were testimonial. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Therefore, the dissent reasoned, the trial court had allowed testimonial evidence to be presented where the declarant was both available and where there had not been a prior opportunity for Peak to cross-examine him, a violation of both Crawford requirements. Peak, 197 S.W.3d at 550. The dissent disputed the plurality’s decision that Peak waived his confrontation rights. It argued that it is not the job of a criminal defendant to cure the trial court’s error. Ibid. Calling Meeks during Peak’s case-in-chief was not an adequate substitute for immediate cross-examination, the dissent reasoned — days later, there would not be the immediacy of cross-examination *471 and the jurors would be reminded of what they had heard.
One month after the Kentucky Supreme Court opinion was published, Peak filed a petition for rehearing in the Kentucky Supreme Court. He argued that “[t]he Court’s majority opinion in this case misconceives the issue and overlooks controlling law in upholding the prosecution’s introduction and use of the unredacted confession of a nontestifying co-defendant.” The court denied the petition for rehearing. See Peak, 197 S.W.8d at 536 (noting the denial in the case caption).
Peak next petitioned the United States Supreme Court for a writ of certiorari. The Court denied the petition after requesting a response on the case after conference. 549 U.S. 1283, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007).
Having exhausted his state-court remedies, Peak filed a petition for a writ of habeas corpus in the district court, raising the single ground that admission of his Meeks’s taped statement at trial violated his rights under the Confrontation Clause.[8] The district court denied his petition but granted a certificate of appealability. The court, in noting the standards set forth by the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996,[9] determined that the decision of the Kentucky Supreme Court was not contrary to Crawford and its progeny, because the district court determined that “the Constitution does not actually require the prosecution to call a witness to the stand in its case-in-chief to satisfy the Confrontation Clause. Rather, the Constitution simply requires that the witness must be made available for cross-examination.” The court reasoned that “Peak’s ability to have called Meeks is fatal to his Confrontation Clause argument. Placing a burden on the prosecution to do more than make the witness available ... goes beyond what the Supreme Court cases dealing with the Confrontation Clause have required.”[10]
Peak appealed the district court’s denial of his petition to this court. We affirm.
II
The Sixth Amendment Confrontation Clause states: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. CONST. amend. VI. Crawford v. Washington held that where “testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a *472 prior opportunity for cross-examination.” Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
Peak’s rights under the Confrontation Clause were at issue when the government played Meeks’s taped statement. The Supreme Court has held that “witnesses” are those who “ ‘bear testimony.’” Crawford, 541 U.S. at 51, 124 S.Ct. 1354 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). The Court held that “testimony” is defined as “ ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’” Ibid. Further, the Court held that “functional equivalent[s]” of in-court testimony, specifically including custodial examinations, are the core class of testimonial statements, noting further that “[statements taken by police officers in the course of interrogations are ... testimonial under even a narrow standard.” Id. at 51-52, 124 S.Ct. 1354; see also id. at 53, 124 S.Ct. 1354 (“interrogations by law enforcement fall squarely within [testimonial hearsay]”). Meeks’s recorded statement did fall under the Confrontation Clause — his statement was made during a custodial examination and bore witness against Peak.
Next, we must consider whether the trial court’s decision to allow the government to play Meeks’s recorded statement during the testimony of Detective Griffin was an error clear enough to permit relief under AEDPA. We may only grant habeas relief to Peak if we find that the trial court’s decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “was based on an unreasonable determination of the facts in light of the evidence that was presented in the State court proceeding.” 28 U.S.C. § 2254(d). The law in question must have been clearly established at the time the state-court decision became final, not after. See Williams v. Taylor, 529 U.S. 362, 380, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (“It is perfectly clear that AEDPA codifies Teague [v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) ] to the extent that Teague requires federal habeas courts to deny relief that is contingent on a rule of law not clearly established at the time the state conviction became final.”).
Further, the Supreme Court has very recently made abundantly clear that the review granted by AEDPA is even more constricted than AEDPA’s plain language already suggests. As long as “fair-minded jurists could disagree on the correctness of the state court’s decision,” then relief is precluded under AEDPA. Harrington v. Richter, - U.S. -, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted). A habeas court “must determine what arguments or theories supported or ... could have supported[] the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.” Ibid. Therefore, if it is possible for a fairminded jurist to believe that the state court’s rationale comports with the holding in Crawford, then we must deny relief. This is a very high standard, which the Court freely acknowledges. See ibid. (“If this standard is difficult to meet, that is because it is meant to be.”).
Crawford requires unavailability and a prior opportunity to cross-examine for the use of testimonial hearsay. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. When Meeks’s statement was played at trial, Meeks was available and there has been no prior opportunity for Peak to cross-examine him. Clearly, if Peak was not “con *473 fronted” with Meeks, then playing Meeks’s statement violated Crawford.
The crux of the issue is whether making a witness available to be called is confrontation, or whether confrontation instead requires the witness to take the stand at the very time, according to Supreme Court precedent that was clearly established when Peak’s conviction became final.[11] It is an open question whether confrontation requires the witness to actually take the stand. At some points, Crawford seems to equate confrontation with cross-examination, which would require the state to put Meeks on the stand when the tape was played. See, e.g., Crawford, 541 U.S. at 61, 124 S.Ct. 1354 (the Clause “commands ... that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.”); id. at 68, 124 S.Ct. 1354 (describing as a violation the admission of a testimonial statement when the petitioner “had no opportunity to cross-examine her”) (emphasis added). Another Supreme Court case decided prior to Peak’s case becoming final also implied that confrontation requires the ability to cross-examine. See Davis v. Washington, 547 U.S. 813, 822 n. 1, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (“The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.”).
However, Crawford also contains language that suggests that confrontation requires only that the witness be made available to be called at trial, not that the witness be put on the stand for immediate cross-examination. See Crawford, 541 U.S. at 59, 124 S.Ct. 1354 (“Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine”) (emphasis added); id. at 53-54, 124 S.Ct. 1354 (“[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify.”) (emphasis added). So there seems to be a question of whether confrontation demands the opportunity to cross-examine the declarant who has been called by the prosecution, or merely that the declarant is available at trial to be called and (cross-)examined. This case requires an answer to this question. The one Supreme Court case discussing this aspect of Crawford that was decided prior to the finality of Peak’s conviction does not dispel the uncertainty. See Davis, 547 U.S. at 822, 126 S.Ct. 2266 (“In Crawford, we held that [the Confrontation Clause] bars admission of testimonial statements of a witness who did not appear at trial....”) (emphasis added) (citation and internal quotation marks omitted). The Supreme Court simply had not, at the time Peak’s conviction became final, clearly held that the ability to cross-examine immediately is required by the Confrontation Clause.
It is not unreasonable to. believe, as did at least three justices on the Kentucky Supreme Court, as well as the trial-court *474 judge, that confrontation only requires that a declarant be made available in the courtroom for a criminal defendant to call during his own case. It can be argued that this ability is equivalent to cross-examination. The defendant can, for example, employ leading questions in questioning a hostile witness on direct examination just as he could in cross-examination. Fed. R. Evid. 611(c); United States v. Hughes, 308 Fed.Appx. 882, 890 (6th Cir.2009). More basically, the defendant has had the ability to confront the witness face-to-face, and to question the witness about the testimonial statement while the witness is under oath.
We are not convinced that the opportunity to call a witness, as opposed to the opportunity to immediately cross-examine a witness, satisfies the Confrontation Clause. However, we are convinced that there is a possibility for fairminded disagreement on the issue, and under clear, and increasingly strident,[12] Supreme Court precedent, that is all that is required to affirm.
Ill
Because there is room for reasoned agreement with the conclusion of the Kentucky Supreme Court that, in the circumstances of this case, the Confrontation Clause does not require the opportunity to cross-examine as soon as an out-of-court statement is introduced, we respect the strictures of AEDPA and AFFIRM the denial of Peak’s habeas petition.

. The victim was identified six years later as Miguel Garcia. Until then, he was called Juan Doe or Unidentified Male, Case FA-99-09. See Dan Berry, A Name and Face No One Knew, but Never Forgot, N.Y. TIMES, Apr. 21, 2008, http://www.nytimes.eom/2008/04/21/us/ 21land.html?pagewanted=all (describing the search for Garcia’s identity).

. Bearden's facts were partially corroborated by the testimony of Mike Cissell, who did not participate in and was not present at the murder, but who helped Peak and Meeks move the victim’s body hours after the murder was committed. Cissell, one of Peak’s best friends, testified that Peak and Meeks had approached him in advance of the murder about killing a man and stealing his cocaine.

. Bearden seems to have known Meeks through a mutual friend when she was in graduate school. She stated she did not know Peak until the night they first discussed killing Mike. Specifically, she stated that she met Peak the night she discussed the victim with Meeks, and that she and Peak had sex later that same night.

. In his taped statement, which was played at trial and is the subject of this appeal, Meeks said that he used to live in the farmhouse.

. These tapes (there were two) were introduced at trial as Commonwealth Exhibit 53A and 53B. The tapes were transcribed in the record but were not provided for our review, so they are quoted from the record transcript.

. Meeks’s statement on the tape differs dramatically from Bearden's version of the events. Meeks recalls Bearden running immediately outside; she recalled being inside the house when she heard shots fired. Meeks’s version leaves out the screaming and Peak shouting that Mike was not dead yet. Meeks makes the incident sound quick, while Bearden’s version had the three at the farmhouse for at least three or four hours.

. Justice Roach concurred only in the result.

. Up to this point in the case history, Peak had proceeded through counsel. He filed his petition for habeas corpus pro se.

. AEDPA states in relevant part:
(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence that was presented in the State court proceeding.
28 U.S.C. § 2254.

. In making its decision, the district court explicitly relied on a Sixth Circuit case, Bailey v. Pitcher, 86 Fed.Appx. 110 (6th Cir.2004). However, this case was decided before Crawford and is irrelevant in any determination of whether the Kentucky Supreme Court was contrary to clearly established federal law when the federal law in question is Crawford’s holding on the right of a criminal defendant to confront the witnesses against him.

. A conviction becomes final when a petition for certiorari is denied or when the time for filing a petition for certiorari elapses. Allen v. Hardy, 478 U.S. 255, 258 n. 1, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). A petition for a writ of certiorari from a state criminal judgment, when any party has filed a petition for rehearing in the state court, must be filed within 90 days after the petition for rehearing is denied. 28 U.S.C. § 2101(c) (incorporating by reference United States Supreme Court Rule 13(1), (3)). Therefore, because Peak filed a petition for rehearing and the petition was denied, he had 90 days from August 24, 2006, when his petition was denied, to file a petition for certiorari. He did not do so, and therefore, his conviction became final on November 22, 2006. See U.S. Sup.Ct. R. 30.

. See, e.g., Greene v. Fisher, - U.S. -, 132 S.Ct. 38, 43-44, 181 L.Ed.2d 336 (2011) ("[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions ... and not as a means of error correction.”) (internal quotation marks omitted); Bobby v. Dixon, - U.S. -, 132 S.Ct. 26, 27, 181 L.Ed.2d 328 (2011) (per curiam) (“Because it is not clear that the Ohio Supreme Court erred ... so transparently that no fairminded jurist could agree with [its] decision, the Sixth Circuit's judgment [granting habeas relief] must be reversed.”); Harrington, 131 S.Ct. 770, 786 (2011) ("A state court’s determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court’s decision.”) (internal quotation marks omitted).