James **HOLLAND, Jr., Petitioner,**

v.

Steven **RIVARD, Respondent.**

Case Nos. 10–14028, 10–14033, 10–14031, 10–14035, 10–14032, 10–14036.

United States District Court, E.D. Michigan, Southern Division.

Signed March 31, 2014.

776

Matthew C. Brown, Bloomfield Hills, MI, for Petitioner.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

DAVID M. LAWSON, District Judge.

Michigan prisoner James Holland, Jr., through counsel, has filed six habeas corpus petitions under 28 U.S.C. § 2254 challenging multiple convictions for crimes against women, including one for first-degree murder. Mich. Comp. Laws § 750.316(1)(a). This cascade of convictions started with the cold case of Lisa Shaw, who was strangled in her apartment in Ypsilanti, Michigan on May 25, 1991. No one was prosecuted for the crime until the investigation was reopened over a decade after Shaw's death. Police eventually charged Christopher Jackson, Shaw's ex-boyfriend, with her murder. Shaw's trial was scheduled to commence in February 2006, with the petitioner as the prosecution's key witness. That changed in January 2006, when the petitioner confessed that he, not Jackson, had killed Shaw. The charges against Jackson were dismissed and the petitioner was tried for and convicted of first-degree murder. During the confession, which occurred from approximately 5:00 p.m. to 9:00 p.m. on January 12, 2006 and continued from 9:00 a.m. to noon on the following morning, Holland also confessed to several additional crimes, including rape, burglary and robbery.

Holland's statements generated a total of six prosecutions, all resulting in convictions, and all of which employed Holland's confession as critical state's evidence. Common to each of Holland's habeas petitions is his argument that the confession was obtained in violation of his Fifth Amendment right to counsel and that it was involuntary because it was induced by

a promise. Therefore, the Court will address the constitutionality of the confession with respect to all of Holland's petitions, and then discuss other issues that are unique to each of the separate habeas petitions. Because the confession came about during the state's trial preparation in the Lisa Shaw murder case, the Court will begin with those facts.

## I.

Christopher Jackson, Lisa Shaw's ex-boyfriend and the father of her toddler son, discovered Shaw's body during the early morning hours of May 27, 1991 at her apartment in Ypsilanti, Michigan. Jackson attempted to gain access to Shaw's apartment at that time by repeatedly buzzing her apartment using the main entrance's security device. Receiving no response, Jackson peered into Shaw's basement-level apartment window, where he saw Shaw lying on the floor face-down and his and Shaw's young son lying beside her. Jackson then knocked the screen from the window and entered the apartment. Jackson nudged Shaw with his foot. She did not respond, but a blanket that was partially covering her shifted, revealing that her arms were tied behind her back. Jackson grabbed his son and fled to his mother's home, from where he called police. At trial, Jackson testified that he fled because he was fearful police would suspect he had killed Shaw. Approximately two years before Shaw's death, Jackson was charged with domestic violence stemming from an altercation in which he struck Shaw. He was placed on probation. He also was charged previously in two additional domestic violence incidents involving different women, although it is unclear from the record how those cases were resolved.

In March 1992, the petitioner informed Detective Brian Miller of the Washtenaw County Sheriff's Department that he had information regarding Lisa Shaw's murder. The petitioner informed police that at approximately 2:00 a.m. on the night of the murder, Jackson purchased drugs from the petitioner, which they then smoked together in Jackson's vehicle. According to the petitioner's statement, Jackson confessed to the petitioner that he had been involved in an altercation with his girlfriend earlier in the evening and, ultimately, strangled her with a telephone cord. It is not clear why the police did not act on that tip at the time.

In 2004, Shaw's murder, by then a cold case, was reinvestigated. Police contacted the petitioner based upon his 1992 statement asserting that Jackson had confessed to him. With the information gathered from several interviews with the petitioner, murder charges were filed against Christopher Jackson. On January 5, 2006, approximately one month before Jackson's trial was scheduled to begin, the petitioner turned himself in for a parole violation stemming from an assault that occurred in Ypsilanti Township. The following day, Washtenaw County Sheriff Detective Mark Neuman interviewed the petitioner regarding sexual assaults that occurred in Ypsilanti in 2005. The interview took place at the state police post in Ypsilanti, Michigan. After approximately two hours, police asked the petitioner about DNA evidence found at the site of a rape on the campus of Eastern Michigan University. In response to that question, the petitioner requested an attorney. Police ceased questioning the petitioner. He then was transferred to a department of corrections facility. The murder of Lisa Shaw was not discussed during this interview.

Seven days later, on January 12, 2006, the petitioner was brought back to the Washtenaw County jail to be interviewed as a witness for the upcoming trial in the

Lisa Shaw murder case. Frank Combs, who contracted with the Washtenaw County Sheriff's Department to conduct interviews, interviewed the petitioner that afternoon at approximately 2:00 p.m. The petitioner informed Combs that he was present when Jackson killed Lisa Shaw. Because this statement differed from the petitioner's earlier statement that Jackson merely told him about the murder after the fact, Combs summoned the detective in charge of the Shaw murder investigation, Everette Robbins. After hearing the petitioner's changed story, Robbins arranged for Harold Raupp to conduct a polygraph examination on the witness statement. Detective Robbins testified that he advised Raupp that the petitioner had earlier invoked his right to counsel, and, therefore, the polygraph should be limited only to information relevant to the petitioner's anticipated testimony against Jackson.

Raupp met with Holland at approximately 5:00 or 5:30 in the evening on January 12, 2006. Raupp conducted a pre-polygraph interview during which he informed the petitioner of the purpose of the interview and assessed whether the petitioner was a good candidate to take a polygraph. He advised the petitioner that the purpose of the polygraph was to determine whether or not the petitioner was present when Lisa Shaw was killed and whether Jackson told him that he had committed the crime. Ultimately, the petitioner admitted to Raupp that he had killed Lisa Shaw and committed several other crimes. The petitioner stated that, on the evening of the murder, he was in the vicinity of Lisa Shaw's apartment. The petitioner had been using drugs, but had none left and no money. The petitioner did not want to walk home because it was raining. The petitioner went to Shaw's apartment because he had a passing acquaintance with her and thought she would let him use her phone. She let him

enter the apartment. The petitioner then described an overwhelming need for drugs and the money with which to buy them. He cut the phone cord with a knife. The petitioner admitted that he then choked Shaw. He disposed of the bed sheets in a dumpster because he viewed them as evidence. Raupp did not conduct a polygraph that evening because it had grown late. Instead, the petitioner was taken back to the "bull pen" at the jail, where he spent the night. He was brought back to the interview room the following morning at about 9:00 a.m. for a polygraph examination. An audiotape of Raupp's January 12, 2006 interview with the petitioner was played for the trial judge during the suppression hearing in state court.

In his conversation with Raupp, the petitioner confessed not only to murdering Shaw, but to a litany of other felonies that led to the murder charge in the Lisa Shaw case and to charges in five additional criminal cases discussed in this opinion. Before trial, the petitioner moved to suppress his confession on the grounds that police interrogated him after he invoked his Fifth Amendment right to counsel and because the confession was involuntary. The trial court held a single hearing for all six of the petitioner's felony cases. The chronology and content of the relevant interviews is discussed in more detail below. The trial court held that the petitioner's statement was voluntarily made and admissible.

In case number 10–14028, the petitioner waived his right to a jury trial and was convicted by the judge of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), and first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b). The felony-murder conviction was vacated at sentencing.

In case number 10–14031, the petitioner was convicted by a jury of six counts of

criminal sexual conduct, kidnaping, first-degree home invasion, and armed robbery against victim Karasten Birge based on events that occurred on September 20, 2005.

In case number 10–14032, the petitioner was convicted by a jury of four counts of criminal sexual conduct, armed robbery, and larceny in a building against victim Erin Horning based on events that occurred on May 11, 2005.

In case number 10–14033, the petitioner was convicted by a jury of four counts of first-degree criminal sexual conduct, three counts of second-degree criminal sexual conduct, and armed robbery involving victim Jessica Mueller based on events that occurred on December 12, 2005.

In case number 10–14035, the petitioner was convicted by a jury of armed robbery, carrying a concealed weapon, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm involving victim Elizabeth Young based on events that occurred on December 24, 2005.

In case number 10–14036, the petitioner was convicted by a jury of armed robbery involving victim Emily Mills based on events that also occurred on December 24, 2005.

Relevant portions of the petitioner's confession made on January 12 and 13, 2006 were admitted in evidence in each of the trials over his objection.

The petitioner was sentenced to life in prison without parole for murdering Lisa Shaw, and he was given lengthy prison terms in each of the other cases. He filed a direct appeal in each case in the Michigan Court of Appeals. In each case, he argued that his confession was involuntary because it was elicited by an inappropriate promise, the interrogation occurred after a request for counsel, and the confession was made after an extended period of questioning and while the petitioner was addicted to illegal drugs. He raised various other issues in some of the cases as well. The court of appeals heard oral argument in all six cases on the same day, and affirmed the petitioner's convictions in six separate unpublished opinions issued together. *People v. Holland,* No. 282817, 2009 WL 80958 (Mich.Ct.App. Jan. 13, 2009); *People v. Holland,* No. 279870, 2009 WL 80356 (Mich.Ct.App. Jan. 13, 2009); *People v. Holland,* No. 281153, 2009 WL 81276 (Mich.Ct.App. Jan. 13, 2009); *People v. Holland,* No. 278876, 2009 WL 80361 (Mich.Ct.App. Jan. 13, 2009); *People v. Holland,* No. 281154, 2009 WL 81275 (Mich.Ct.App. Jan. 13, 2009); *People v. Holland,* No. 281152, 2009 WL 81277 (Mich.Ct.App. Jan. 13, 2009). The state supreme court denied leave to appeal in all of his cases.

The petitioner then filed six habeas corpus petitions, each of which challenges the admissibility of his confession. He frames the issue as follows:

> Petitioner's 5th Amendment right to counsel was violated where he requested an attorney during custodial interrogation in the Washtenaw County Jail on 1/6/2006; where counsel was not provided; and where instead of providing legal counsel, a law enforcement officer promised Petitioner a visit with his mother and fiancée in order to elicit an inculpatory statement about a series of unsolved state law crimes.

The petitioner raises additional issues in some of his other habeas petitions. The respondent filed answers to the several petitions, raising a series of inapplicable affirmative defenses, and eventually discussing the merits of the claims. The Court will discuss the common question first, as it is the only one that is raised in

the murder case, and then address the issues that are raised in the other cases.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis,* 144 F.3d 429, 433 (6th Cir.1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been 'objectively unreasonable.' " *Wiggins,* 539 U.S. at 520–21, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold,* 73 F.3d 81, 84 (6th Cir.1996) (stating that "[t]he court gives complete deference to state court

findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases . . . .

A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of [the Supreme] Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a]

state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785–86 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb,* 673 F.3d 465, 472 (6th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 931, 184 L.Ed.2d 730 (2013). The *Peak* court suggested that *Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests." *Ibid.*

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 777, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (citations and quotation marks omitted); *see id.* at 777, 130 S.Ct. 1855 (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached"); *see also Peak,* 673 F.3d at 473–74; *Bray v. Andrews,* 640 F.3d 731, 737–39 (6th Cir.2011); *Murphy v. Ohio,* 551 F.3d 485, 493–94 (6th Cir.2009); *Eady v. Morgan,* 515 F.3d 587, 594–95 (6th Cir. 2008); *Davis v. Coyle,* 475 F.3d 761, 766–67 (6th Cir.2007); *King v. Bobby,* 433 F.3d 483, 489–90 (6th Cir.2006); *Rockwell v. Yukins,* 341 F.3d 507, 511 (6th Cir.2003) *(en banc).* Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

### A. Case Number 10–14028— The Lisa Shaw Murder

The petitioner raises two claims in this petition: (1) that his confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because police interrogated him after he invoked his right to counsel; and (2) that his confession was involuntary because it was elicited by a promise that the petitioner would be permitted to visit with his mother and fiancée.

#### 1. Fifth Amendment Right to Counsel

There is no dispute that after the petitioner turned himself in for a parole violation on January 6, 2006, he was interrogated in police custody at the state police post, he asked to consult with an attorney, and the questioning ceased. He argues that the police interrogated him while he was in custody and after he had invoked his right to counsel. The petitioner argues that his confession made during the interviews on January 12 and 13, 2006 should have been suppressed because it was the result of custodial interrogation after he invoked his right to counsel.

 The Fifth Amendment, which is made applicable to the states by the Fourteenth Amendment, protects an accused from compulsory self-incrimination. In *Miranda v. Arizona,* the Supreme Court held that this prohibition against compelled self-incrimination requires a custodial interrogation to be preceded by advice that the accused has the right to an attor-

ney and the right to remain silent. · 384 U.S. at 479, 86 S.Ct. 1602. It is settled law that if the accused invokes his right to counsel, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. 1602. In *Edwards v. Arizona,* the Supreme Court "reconfirm[ed]" the rule established in *Miranda,* that when a suspect has invoked the right to have counsel present during custodial interrogation, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. 1880; *see also United States v. Dupree,* 323 F.3d 480, 486 (6th Cir.2003). Moreover, after a suspect has invoked his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. This rule "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (internal quotation omitted).

■ In this case, it is undisputed that the petitioner asked for counsel when police interrogated him on January 6, 2006. It is also undisputed that the police ceased questioning the petitioner at that point as required by *Edwards.* In fact, *Edwards* required police to cease interrogating the petitioner while in custody about *any* investigation because the Fifth Amendment right to counsel is not offense specific. It matters not that the subsequent interrogation focuses on a different crime, *Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), or that the questioning is conducted by a different law enforcement authority, *Minnick v. Missis-*

*sippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Subsequent custodial interrogation is not allowed even when the suspect has met with an attorney after the first interrogation. *Ibid.* It is only after custody ends and time ˙passes—at least fourteen days, according to the Supreme Court, *Maryland v. Shatzer,* 559 U.S. 98, 110–11, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010)—that the invocation of the right to counsel and the "protective umbrella" provided by *Edwards* closes on a subsequent custodial . interrogation. *Id.* at 109, 130 S.Ct. 1213 (quoting *Solem v. Stumes,* 465 U.S. 638, 644, n. 4, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984)).

■ The Michigan Court of Appeals was not troubled by the police questioning on January 12 and 13, 2006, even though the˙ petitioner had invoked his right to counsel, because that court believed that the petitioner "initiated the discussion about his involvement in the case at bar and that he was not being interrogated at the time he confessed." *Holland,* 2009 WL 80958, at *4. The court reasoned that "[t]he questions posed to [the petitioner] were directed toward his knowledge as a witness in a homicide investigation in which [he] was not a suspect; these questions were not reasonably likely to elicit information about the case at bar." *Ibid.*

It is difficult to square that observation with the record in this case. Based on the testimony at the suppression hearing, it is plain that the police wanted to question the petitioner about Lisa Shaw's murder. It is also apparent that he was not viewed as a suspect initially. However, after questioning on the morning of January 12, the petitioner gave a statement that was inconsistent—and potentially more incriminating—than his earlier statement made years before. Earlier he had told the police that Jackson admitted to him that he killed Shaw; but at the police station on

January 12, the petitioner said he actually was present when Jackson killed her. The police, therefore, arranged for a polygraph examination to be conducted that afternoon by Harold Raupp. Raupp posed questions to the petitioner; during the conversation, the petitioner told Raupp that he had "aces ... up his sleeve," Suppression H'rg Tr., vol. I at 55, and wanted to speak to Frank Combs, a contract employee with the sheriff department. When Combs returned, the petitioner began to describe crimes with which Raupp and Combs were unfamiliar. So they obtained a "packet" that listed several crimes. As Raupp tells it, "I went out and got a synopsis of what they were and came back and was asking questions about not only those cases but others." *Id.* at 71. They described a cooperative subject who was responding to questions about crimes he admitted committing.

 "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The techniques may be subtle: "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Ibid.* Raupp's and Combs's conduct plainly constituted interrogation, and the state court's decision otherwise is an unreasonable application of *Innis*. Not all of the petitioner's statements came in response to questioning. The interrogation about the Shaw murder was not intended to elicit incriminating responses about the host of other crimes the petitioner committed. As the Sixth Circuit has explained, " '[v]olun-teered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by the holding in *Miranda*." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir.2003) (quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602). But once the petitioner started talking, Raupp and Combs encouraged further disclosures by their continued questioning.

The "interrogation" component of the petitioner's claim, however, is not dispositive. In order for the petitioner to remain under *Edwards's* "protective umbrella," he must have been in custody on January 12 and 13 when he made the incriminating statements. *Shatzer*, 559 U.S. at 111, 130 S.Ct. 1213 (stating that "[i]n every case involving *Edwards*, the courts must determine whether the suspect was in custody when he requested counsel *and* when he later made the statements he seeks to suppress" (emphasis added)). And as the Supreme Court has explained—or, more accurately, declared—under the Fifth Amendment, there is "custody," and then there is "*Miranda* custody." *Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012) (stating that "[a]s used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion").

 Certainly, "all forms of incarceration" curtail an individual's freedom of movement. *Shatzer*, 559 U.S. at 112, 130 S.Ct. 1213. But in *Howes v. Fields*, the Supreme Court endorsed the idea that restrictions on an individual's freedom of movement alone will not establish *Miranda* custody. *Howes*, 132 S.Ct. at 1190 (stating "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody" (quoting *Shatzer*, 559 U.S. at 112, 130 S.Ct. 1213)). Instead, the determination of custody must be based on whether the prison-

er is in a situation " 'in which the concerns that powered the *[Miranda]* decision are implicated.' " *Howes,* 132 S.Ct. at 1192 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). "[S]ervice of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.* at 1191.

▇▇▇▇▇ The first step in making a *Miranda* custody determination is "to ascertain whether, in light of 'the objective circumstances of the interrogation,' *Stansbury v. California,* 511 U.S. 318, 322–23, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*per curiam*), a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)." *Id.* at 1189. Courts must examine " 'all of the circumstances surrounding the interrogation' " to determine how a suspect would gauge his " 'freedom of movement.' " *Ibid.* (quoting *Stansbury,* 511 U.S. at 322, 325, 114 S.Ct. 1526). Factors relevant to this determination include the location of questioning, duration of questioning, statements made during the interview, presence or absence of physical restraints during questioning, and whether the interviewee was released at the end of the questioning. *Ibid.* However, the freedom-of-movement inquiry "is simply the first step in the analysis, not the last." *Ibid.*

In *Fields,* the inmate, while serving a sentence in a Michigan jail, was escorted by a corrections officer to a conference room. There, two armed sheriff's deputies questioned him about allegations that, prior to his incarceration, he engaged in sexual conduct with a 12–year old boy. The Supreme Court held that Fields was not taken into *Miranda* custody. In reaching this decision the Court acknowledged that the following facts supported a finding of

custody: Fields did not invite the interview and was not advised that he could decline to speak to the deputies; the interview lasted five to seven hours and continued past the inmate's typical bedtime; the deputies who questioned Fields were armed; and one of the deputies used "a very sharp tone" and profanity. *Id.* at 1192–93. The Court found, however, that these circumstances were offset by others: most importantly, Fields was told at the outset that he could get up and leave the interview whenever he wanted; Fields was not physically restrained or threatened; the interview took place in a well-lit, average-sized conference room; Fields was offered food and water; and the door to the conference room was sometimes left open. *Id.* at 1193. The Court concluded that these factors created an interrogation environment in which " 'a reasonable person would have felt free to terminate the interview and leave.' " *Id.* (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664–65, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). Therefore, the Court ruled, Fields was not in "*Miranda* custody" when he made his incriminating statements.

Neither the trial court nor the state appellate courts addressed whether the petitioner was in *Miranda* custody during the January 12, 2006 interviews. No matter. If under *Fields* the petitioner was not in custody, then no *Miranda–Edwards* violation can be found. *See Sheets v. Simpson,* ── U.S. ──, 132 S.Ct. 1632, 182 L.Ed.2d 230 (2012) (granting petition for writ of certiorari, vacating judgment which had suppressed certain statements made by the imprisoned petitioner during a prison questioning by officers investigating a crime unrelated to the imprisonment, and remanding to Sixth Circuit Court of Appeals for further consideration in light of *Fields* ).

■ In this case, consideration of the relevant factors identified by the *Fields* court favors a finding that during the interviews on January 12 and 13, 2006, the petitioner was not in *Miranda* custody. First, the location of the interview was not coercive. The petitioner was interviewed in a conference room at the Washtenaw County jail approximately 6 feet by 6 feet in size, with a table, chairs, and window. The door to the room did not have a lock on it. The fact that the conference room was located at the jail does not render the environment coercive. A person who is "cut off from his normal life and companions," *Shatzer*, 559 U.S. at 106, 130 S.Ct. at 1220, and "abruptly transported from the street into a 'police-dominated atmosphere,'" *Miranda*, 384 U.S. at 456, 86 S.Ct. 1602, may feel coerced into answering questions." *Fields*, 132 S.Ct. at 1190. But the petitioner was already incarcerated on a parole violation. Although he was brought there from prison, the atmosphere at the jail did not involve "the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation at the police station." *Fields*, 132 S.Ct. at 1191 (quoting *Shatzer*, 559 U.S. at 104–05, 130 S.Ct. 1213).

Second, the interview, although not short, was not unduly lengthy. In *Fields*, the interrogation lasted between five and seven hours, ending at midnight. The Court held that the length of the interrogation coupled with the late hour, which kept Fields up well past the hour when he generally went to bed, lent some support to a finding that Fields was in *Miranda* custody. In this case, on January 12, the petitioner was interviewed by three different law enforcement officers, two of whom, Frank Combs and Detective Robbins, each interviewed the petitioner for less than one-half hour. The third interrogator, poly-graph examiner Harold Raupp, interviewed the petitioner for approximately three hours. Raupp ended the interview at roughly 9:00 p.m. because he determined the hour had grown too late to conduct a polygraph. At that time, the petitioner was returned to a holding cell. The duration of the interviews does not support a finding of custody. Two were short and the third, although somewhat lengthy, did not run late into the night or disrupt the petitioner's normal sleep schedule. The interview continued the next day at around 9:00 a.m. and ended at noon. The petitioner agreed to take a polygraph test during that time. The additional three hours of questioning did not transform the circumstances into a coercive environment in which a reasonable person would believe he could not terminate the interview at any time.

■ Third, the nature and tenor of the interviews in this case support a finding that the petitioner was not in custody. The focus of an interrogation is relevant to a custody determination. *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526. In *Fields*, the purpose of the interview was to confront Fields with allegations that he abused a 12–year–old child. And, Fields stated several times during the interview that he no longer wanted to talk to deputies. In *Alvarado*, the Court held that the following factors weighed against a finding that Alvarado was in custody: the detective "focused on [another individual's] crimes rather than Alvarado's"; and the police "did not threaten [Alvarado] or suggest he would be placed under arrest." *Alvarado*, 541 U.S. at 664, 124 S.Ct. 2140.

In this case, the petitioner was not a suspect on January 12, 2006. The petitioner was informed that he was being interviewed as the key prosecution witness for the upcoming Jackson murder trial. He was not confronted with any evidence or, indeed, even any allegations that he was involved in the murder. These facts weigh in favor of a finding that the petitioner was not in custody.

In *Fields*, the Supreme Court held that the facts that Fields did not invite the interview or consent to it in advance, that he was not advised he was free to decline to speak to the deputies, and that the deputies were armed and spoke in sharp tones lent some support to Fields' argument that he was in custody. In this case, although the petitioner did not invite the interview or consent to it in advance, he was advised repeatedly by Combs, Raupp, and Robbins, who read him his *Miranda* rights, that he did not have to speak to the interviewers. He was also described by Raupp as in control of the situation. And the interrogation started with the idea that the petitioner was a prosecution witness in an upcoming trial, not a suspect in the murder. Although that status evidently changed, the dramatic shift occurred when the petitioner himself volunteered that he had "aces" that he wanted to reveal to Combs. That revelation does not appear to have been provoked by questioning. The record does not show whether Raupp or Combs were armed, but Detective Robbins was not. There is no indication in the record whether the petitioner was restrained during the interview. Finally, the petitioner was not returned to Jackson prison from where he was transported for the January 12th interview. Instead, he spent the night in a jail holding cell so that he would be available for a polygraph the next morning. This fact lends some support to a finding of custody; however, it is insufficient to outweigh the factors favoring a finding that the petitioner was not in custody.

Based on all the circumstances taken together, the petitioner was not in *Miranda* custody during the January 12 and 13, 2006 interviews. Therefore, the *Miranda–Edwards* protections were not triggered and the petitioner's statements properly were admitted at his several trials.

2. Voluntariness of Confession

The main thrust of the petitioner's argument at the suppression hearing in state court was that his statements were not voluntary because they were induced by a promise that police would allow him to have a visit from his mother and fiancée. The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *See Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"); the length, location, and continuity of the interrogation; the suspect's maturity and education; the suspect's physical condition and mental health; and whether the suspect was advised of his

*Miranda* rights. *Withrow v. Williams,* 507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Without coercive police activity, a confession will not be deemed involuntary. *Connelly,* 479 U.S. at 167, 107 S.Ct. 515 (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").

The Michigan Court of Appeals rejected the petitioner's claim that a promise induced his confession and found it to be made voluntarily:

> The existence of a promise is just one of the circumstances to consider in examining whether, under the totality of the circumstances, the statement was made voluntarily.... Raupp testified that defendant first introduced the topic of speaking with his family, although defendant claims that Raupp brought it up. We find no basis to upset the trial court's determination that Raupp's testimony was more credible on this issue.... Considering that Raupp had no knowledge of defendant's other crimes before defendant told him, Raupp had no reason to promise defendant anything in order to obtain a confession. In fact, Raupp was unaware that there was even a possibility of obtaining a confession or confessions. In addition, Raupp did not have the authority to grant defendant's request to see his family. To the extent that there was any promise, it was merely Raupp's promise to pass along defendant's request to see family to Raupp's supervisors. Accordingly, the record does not support a finding that defendant was induced or coerced into making the incriminating statements, and the trial court did not err in holding that defendant's incriminating statements were not improperly induced by a promise.

*Holland,* slip op. at 5.

The Supreme Court has held that a combination of threats and promises may be sufficient to overbear an interviewee's will and constitute impermissible coercion. *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). The circumstances in *Lynumn* are distinguishable from those presented in this case. In *Lynumn,* the defendant was interrogated in her apartment while surrounded by three police officers and a police informant. The officers threatened that if she did not cooperate, state financial aid for her infant children would be cut off and the children would be taken from her. In this case, the petitioner was not facing threats to the physical and financial well-being of his minor children, or, for that matter, of his mother and fiancée. His desire to prepare his loved ones for his planned confession does not render the confession involuntary or the police conduct coercive. Individuals confess for a host of reasons. Law enforcement officers are not required to attempt to parse out or identify an individual's motivations for testifying. *See Bobby v. Dixon,* —— U.S. ——, 132 S.Ct. 26, 29–30, 181 L.Ed.2d 328 (2011) (holding that police may urge a suspect to confess for a variety of reasons, including that doing so will heighten chances the suspect will be able to "cut a deal"). Here, there is no indication that the petitioner was threatened in any way. Access to loved ones may certainly be reasonably restricted during incarceration. There is no indication that police threatened the petitioner with any loss of visitation unrelated to the fact of his imprisonment.

\* \* \* \* \* \*

The petitioner's statements to the police on January 12 and 13, 2006 were made

voluntarily. Although the petitioner asked to see a lawyer during a custodial interrogation session seven days earlier, the subsequent questioning a week later did not take place in a setting that amounts to *Miranda* custody. Admission of those statements at his several trials, therefore, did not abridge the petitioner's rights under the Fifth Amendment.

## B. Case Number 10–14031—The Rape and Robbery of Karasten Birge

According to the state court of appeals,

During the evening of September 20, 2005, defendant entered the victim's apartment through a sliding glass door and put a belt around her neck. He asked for money and became angry when she only produced approximately one dollar. He forced the victim to engage in various sexual acts and, when the victim told him that she could get money from an automatic teller machine (ATM), he made the victim clean herself up and drove her at knifepoint to an ATM. The victim withdrew $100, which defendant took. Defendant forced the victim to drive to another ATM and then fled on foot. The victim returned to her apartment building, where she asked a neighbor for help and was taken to a hospital.

*Holland,* 2009 WL 80356, at *1. At trial, the state offered the petitioner's confession in evidence, plus testimony from a laboratory analyst who described the results of DNA testing that incriminated the petitioner. The witness was allowed to relate the work that two of her non-testifying colleagues had performed. The petitioner's attorney objected on hearsay grounds but did not raise an objection under the Confrontation Clause. The petitioner's appellate attorney raised the Confrontation Clause claim, but the court of appeals addressed it under a plain error standard because the constitutional issues had not been preserved.

In this Court, in addition to challenging the admission of his confession, the petitioner contends that:

[THE PETITIONER]' S SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES WAS VIOLATED WHEN THE PROSECUTOR INTRODUCED EXPERT TESTIMONY BASED IN–PART ON OUT–OF–COURT STATEMENTS OF A TESTAMENTARY NATURE WHICH WERE NOT IN EVIDENCE.

and

[THE PETITIONER] WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL WHEN HIS ATTORNEY FAILED TO OBTAIN A DNA EXPERT, DID NOT SEEK TO EXCLUDE THE PROSECUTOR'S EXPERT DNA WITNESS, [AND] FAILED TO OBJECT TO IRRELEVANT BUT PREJUDICIAL TESTIMONY OF A DETECTIVE.

1.

■ The petitioner's Confrontation Clause claim is based on the State's failure to call all of the laboratory technicians who performed DNA analyses on swabs taken from items in the field and the known samples taken from the rape victim and the petitioner. Three technicians testified: Rosemary Jones, a Michigan State Police laboratory employee who said that she sent a "buccal swab" of the victim to an outside laboratory; Laurie Bruski, another state police laboratory employee who testified that one of the tests from the outside laboratory yielded male DNA (containing a "Y" chromosome), and therefore "Y–STR" testing was performed on that sample; and Julie Kowaleski, the analyst from the outside laboratory. Kowaleski testified that Y–STR testing is used when looking for a

male match, and the sample contains female DNA as well. She tested a shirt that the victim said was used to cover her face; it contained a "mixed profile" of male DNA. Kowaleski relied on Lewis's work on the known sample from the petitioner and concluded that samples taken from the scene contained DNA that matched the petitioner's DNA, or that of his father or paternal grandfather.

The petitioner argues that he was denied the right to confront the non-testifying laboratory technicians because he never had an opportunity to cross-examine them. The state court of appeals, on plain error review, found no reversible error. It determined that Lewis did not provide any subjective opinion about the known sample she tested. The court also determined that no prejudice was shown because the DNA evidence was not very convincing. The court stated:

> In evaluating the issue of prejudice, we also find it significant that Kowaleski could not say with certainty that the DNA taken from the victim's shirt belonged to defendant. Although the DNA evidence might have provided additional support for the prosecutor's case, considering the strong evidence to establish defendant's identity without the DNA evidence, any alleged error based on MRE 703 did not affect the outcome of the trial. Therefore, reversal is not warranted.

*Holland,* 2009 WL 80356, at *4.

■■■ The Confrontation Clause of the Sixth Amendment, which is applicable to the States through the Fourteenth Amendment, *Idaho v. Wright,* 497 U.S. 805, 813, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), guarantees a defendant in a criminal prosecution "the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." *Giles v. California,* 554 U.S. 353, 358, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (citing *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). "Testimonial" evidence includes, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [ ] police interrogations." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. It is well-established that reports memorializing the work performed by laboratory analysts when carrying out forensic duties are testimonial statements subject to the requirements of the Sixth Amendment, as interpreted by *Crawford. Bullcoming v. New Mexico,* —— U.S. ——, ——, 131 S.Ct. 2705, 2717, 180 L.Ed.2d 610 (2011) (holding that such "report[s] fell within the core class of testimonial statements described in this Court's leading Confrontation Clause decisions" (internal quotation marks and citation omitted)); *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 310, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (same).

■■■ However, violations of the Confrontation Clause are subject to harmless-error analysis, *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Vasquez v. Jones,* 496 F.3d 564, 574 (6th Cir.2007), and habeas relief may be granted only if a constitutional error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "When a federal judge in a habeas proceeding is in

grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Whether a violation of the Confrontation Clause was harmless error depends on a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431.

The state appellate court found that the DNA evidence was weak, and the other evidence in the case against the petitioner was substantial. That evidence included the victim's voice identification of the petitioner, the petitioner's link to the area where the victim lived, and, of course, the petitioner's confession. The Court agrees with the state court's assessment. There is no grave doubt about the outcome of the trial, and it cannot be said that the admission of the DNA evidence if some of it was untested by cross-examination, had a substantial and injurious effect or influence on the jury's verdict.

### 2.

■ The petitioner argues that his trial attorney was constitutionally ineffective because he did not retain a defense DNA expert. The two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005). To establish a claim of ineffective assistance of counsel, a defendant must show both deficient performance and prejudice. *Premo v. Moore,* 562 U.S. 115, ——, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011) (quoting *Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009)).

Because of the high deference accorded state court determinations by AEDPA, establishing that counsel was ineffective and, therefore, the petitioner was denied his right to counsel under the Sixth Amendment is difficult. The Supreme Court recently explained:

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky,* 559 U.S. [356, 371], 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010).... The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.,* at 689, 104 S.Ct. 2052; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at 123, 129 S.Ct. 1411. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Ibid.* Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel

satisfied *Strickland's* deferential standard.

*Richter,* 131 S.Ct. at 788.

■ On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles,* 556 U.S. at 123, 129 S.Ct. 1411 (quoting *Schriro v. Landrigan,* 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)). Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Ibid.* (citing *Alvarado,* 541 U.S. at 664, 124 S.Ct. 2140).

The state court of appeals rejected this argument, it appears, on two grounds. First, the court believed that the prospect of finding a DNA expert favorable to the defense was an indulgence in speculation. Second, the court noted that the trial court had authorized funds for defense counsel to retain a DNA expert, and there was no reason to assume that the effort was not made. Those conclusions are reasonable. The petitioner has not offered even a suggestion of what a defense DNA expert might have contributed to the trial inquiry. Moreover, it is reasonable to conclude that defense counsel attempted to locate someone who could provide expert advice, and no one answered the bell. The decision not to call such a witness, therefore, must be relegated to trial strategy, which is beyond the realm of criticism for defective performance. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (holding that counsel's conduct is entitled to the strong presumption that it falls within the wide range of reasonable professional assistance, and the petitioner must overcome the presumption that the conduct "might be considered sound trial strategy" (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955))); *Higgins v. Renico,* 470 F.3d 624, 632 (6th Cir.2006) (observing that "[s]uch [strategic] choices can vary greatly from attorney to attorney and from case to case, and reviewing courts must scrutinize these choices with a great deal of deference").

\* \* \* \* \* \*

The Court finds no basis to grant relief on this habeas petition.

C. Case Number 10–14032—The Rape and Robbery of Erin Horning

In this case, the trial evidence established that the petitioner confronted the victim when she was alone in a biology laboratory at Eastern Michigan University, and he sexually assaulted her. She reported the incident immediately. Investigating officers found at the scene a knife, two pieces of a condom wrapper, and a plastic tip consistent with the top of a lubricant package. Testing of the condom wrapper eventually yielded a mixture of DNA consistent with the victim and the petitioner. The victim told investigators the approximate height, clothing and shoes of her attacker. She also assisted police in creating a composite sketch. The victim also participated in two physical lineups, the first only a few months after the assault and the second almost a year later. She did not identify anyone in the first lineup and said that someone other than the petitioner looked similar to her attacker in the second. The petitioner was in the second lineup. After reading about the petitioner's involvement in an unrelated crime in December 2005 and seeing his picture online, the victim believed she found her attacker. She identified him in court at the trial.

On appeal, the petitioner challenged his confession on the same grounds as in the other cases. He also argued, as he does

here, that his attorney was constitutionally ineffective by not challenging the victim's in-court identification, and failing to retain a defense DNA expert. The state court of appeals rejected the argument relating to the DNA expert because the record showed that defense counsel obtained funds from the trial court to retain an expert, and later obtained additional funds. The court concluded that the decision not to call such an expert was strategic. This Court agrees for the reasons discussed above relating to case number 10–14031. Moreover, the petitioner has not suggested how a defense DNA expert might have helped his case. The petitioner has not shown prejudice resulting from not calling one.

█ The court of appeals also concluded that the victim's in-court identification was not unduly suggestive, and therefore it would have been futile for defense counsel to move to suppress it. That decision was reasonable as well. It is true that the victim was hesitant to identify the petitioner as her attacker. She was able to view him for about 20 minutes during the assault, but her view was compromised. Her testimony reflects her uncertainty.

█ Due process protects the accused against the introduction of evidence that results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois,* 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). To determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive. If the court finds that the procedure was unduly suggestive, the court must then consider the totality of the circumstances to determine whether a "substantial likelihood of misidentification" existed. *Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

█ Where suggestive identification procedures have been used by the police, in some instances a victim's identification can be suppressed. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). However, the petitioner fails to identify a single aspect of the State's investigation that was unnecessarily suggestive or that influenced the victim's identification. "[W]hat triggers due process concerns is *police use* of an unnecessarily suggestive identification procedure." *Perry v. New Hampshire,* ── U.S. ──, ──, 132 S.Ct. 716, 721 n. 1, 181 L.Ed.2d 694 (2012) (emphasis added). Therefore, the petitioner asserts no valid basis on which counsel could have challenged the lineups or moved for a *Wade* hearing, and the Michigan Court of Appeals's decision was a reasonable application of *Strickland.*

The petitioner's conviction in the Erin Horning case did not violate the Constitution or federal law.

D. Case Number 10–14033—The Rape and Robbery of Jessica Mueller

According to the Michigan Court of Appeals,

This case arose from a robbery and sexual assault that took place at a tanning salon in Ypsilanti, Michigan. On December 12, 2005, the victim was working alone at the tanning salon in the early evening. Defendant entered the store through the front door while the victim momentarily stepped out the back door. When the victim returned to the salon, defendant inquired about the price of a tanning package. He then suddenly rushed the victim, knocked her to the ground, repeatedly punched her, forced her to remove her pants and underwear, and held an object that felt like metal to the victim's neck. Defendant forced the victim to crawl to the front of

the store and give him money from the cash register and her purse. He then instructed her to enter a tanning room, where he attempted to penetrate her with his penis, engaged in multiple acts of digital penetration, and forced her to perform fellatio. Defendant fled when another customer entered the store.

*Holland*, 2009 WL 81275, at *1. DNA evidence was offered at trial, as was the petitioner's confession. The petitioner argues in his habeas petition that his trial attorney was constitutionally ineffective once again because he did not call a defense DNA expert. He also says that his lawyer did not perform adequately because he failed to object to the admission of the DNA expert's testimony on the ground that it was based on out-of-court statements from other experts. He also challenged the admission of his confession.

The state court of appeals rejected the argument that defense counsel should have called a DNA expert to discuss sample sizes and probabilities because the failure to do so did not deprive the petitioner of a substantial defense. Instead, the court found that the information was elicited from the State's expert on cross-examination. And the court noted: "Defense counsel indicated to the trial court that he believed, in his professional opinion, that further questioning of the prosecution's expert would be detrimental to defendant's case." *Holland*, 2009 WL 81275, at *4. The decision not to call a DNA expert to discuss the statistical analysis was determined to be a strategic choice.

The court dispensed with the argument that defense counsel should have objected to the foundation for the State's DNA expert's testimony by stating that the record would not have supported such an objection. "The record reflects that the expert testified about the DNA testing that she performed herself, and she did not testify about the results of tests performed by another laboratory." *Ibid.*

Both of these conclusions are reasonable and supported by the record. As discussed above, strategic choices by defense counsel, when reasonable, do not amount to defective performance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. And defense counsel does not perform defectively by failing to make a meritless objection. *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir.1999) (holding that "there can be no constitutional deficiency in ... counsel's failure to raise meritless issues").

The petitioner is not entitled to a writ of habeas corpus in this case.

E. Case Number 10–14035—The Robbery of Elizabeth Young; Case Number 10–14036—The Robbery of Emily Mills

In each of these cases, the sole issue raised in the petitions is the validity of the petitioner's confession against his Fifth Amendment challenges. For the reasons discussed above, the Court finds that the State committed no constitutional violation when it questioned the petitioner at the Washtenaw County jail on January 12 and 13, 2006. The state courts did not unreasonably apply federal law when they determined that the confession ought not be suppressed. Therefore, the petitioner is not entitled to habeas relief in these cases

### III.

For the reasons stated, the Court concludes that the state courts' decisions in each of these cases were not contrary to federal law as determined by the Supreme Court, nor did they unreasonably apply Supreme Court precedent. Therefore, the petitioner has not established that he is presently in custody in violation of the Constitution of the United States.

Accordingly, it is **ORDERED** that the petitions for writs of habeas corpus are **DENIED.**